IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2015 Session

**WILLIAM THOMAS MAYERS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County
No. 2010-A-572     J. Randall Wyatt, Jr., Judge**

---

**No. M2014-01704-CCA-R3-PC – Filed March 31, 2016**

---

The Petitioner, William Thomas Mayers, filed a petition for post-conviction relief in the Davidson County Criminal Court, alleging that his counsel was ineffective at trial and on appeal.  The post-conviction court denied the petition, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Richard C. Strong, Nashville, Tennessee, for the Appellant, William Thomas Mayers.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A Davidson County Criminal Court Jury convicted the Petitioner of aggravated burglary, attempted aggravated burglary, and theft of property over $500, and he received a total effective sentence of twenty-five years.  See State v. William Thomas Mayers, No. M2011-00954-CCA-R3CD, 2012 WL 4572169, at *1 (Tenn. Crim. App. at Nashville, Oct. 1, 2012).  The record reveals that on November 13, 2009, Robin Tate-Johnson, who "was kind of the neighborhood watch lady," was looking out of a window of her house when she saw a slender white man, who was not carrying anything, walk past her house.  A few minutes later, Ms. Tate-Johnson saw the same man walking past her house in the opposite direction with a backpack over his shoulder and a box in his arms.  Ms. Tate-

Johnson followed the man and saw him walk up to a house and attempt to raise a front window. Thereafter, the man walked behind the house, and Ms. Tate-Johnson briefly lost sight of him. When Ms. Tate-Johnson regained sight of the man, she followed him to a CVS drug store on Murfreesboro Road. The man went into the store for a few minutes. When he came out, Ms. Tate-Johnson followed him to the Budget Inn on Murfreesboro Road. She saw the man get into a Chevrolet Blazer with the license plate number "036 VZV." At that time, Ms. Tate-Johnson called the police to report the suspicious activity.

The police learned that the home of Ms. Tate-Johnson's neighbor, Laurel Smith, had been burglarized on November 13. Ms. Smith testified at trial that after the burglary, she searched for two hours before locating her three cats and "very large redbone coonhound" that had gotten loose in the neighborhood. Later that evening, when Ms. Smith tried to touch her dog, the dog "would hit the floor like she was being struck at," which it had never done before the burglary. Ms. Smith said that "it was obvious [the dog] had gone through some kind of trauma."

A couple of days after November 13, Nashville Police Detective Kevin Wallace went to the Budget Inn to perform surveillance. He saw two black men, a slender white man, and a white woman get into the Blazer Ms. Tate-Johnson had seen and drive away. Detective Wallace followed the Blazer and eventually made an investigative stop. Detective Wallace spoke with the white man, who was the Petitioner, and the Petitioner denied any involvement in the burglary. Nevertheless, the police arrested the Petitioner and the woman on outstanding warrants.

Thereafter, the police checked the records of area pawnshops and learned that someone using the Petitioner's name had pawned three pieces of jewelry at Berry's Pawn Shop on November 13. Detective Wallace placed a hold on the items. On November 21, Detective Wallace, the victim, and the victim's roommate went to the pawnshop. The victim and her roommate identified two rings pawned by the Petitioner as the victim's property; the third piece of jewelry did not belong to her. Detective Wallace explained that pursuant to police policy, he left the jewelry at the pawnshop but placed a hold on the items. He later learned that the pawnshop had "melted down" the rings.

Detective Wallace contacted the person who lived at the house where the Petitioner had tried to raise the front window and learned that the front window and rear door had been damaged but that nothing had been taken.

Detective Wallace said that fingerprints were taken from the victim's residence but that the prints did not match the Petitioner's prints. Ms. Tate-Johnson was not shown a lineup and identified the Petitioner for the first time at the preliminary hearing. Detective Wallace stated that he thought a photograph identification was required to pawn items at Barry's Pawn Shop but that he was not sure. He knew that the Petitioner's

name, driver's license number, and birthdate were written on the pawn ticket for the rings. A surveillance video from a nearby CVS showed a white male carrying a backpack and wearing a baseball cap and sunglasses walking into the store. Detective Wallace opined that the man was the Petitioner.

After this court denied relief on direct appeal, the Petitioner filed a petition for post-conviction relief, which is the subject of the instant appeal, alleging that his counsel was ineffective at trial and on appeal. At the post-conviction hearing, the Petitioner testified that trial counsel was appointed to represent the Petitioner after he was indicted. The Petitioner said that counsel met with him four or five times and that the longest meeting lasted approximately thirty minutes.

The Petitioner acknowledged that trial counsel provided him copies of the discovery. The Petitioner maintained that he did not review the discovery with counsel but that he reviewed it on his own and called counsel to discuss any problems he noticed. Trial counsel never indicated to the Petitioner that he interviewed either the victim or Ms. Tate-Johnson.

The Petitioner said that he and counsel discussed the destruction of the rings. At the Petitioner's behest, counsel filed a Ferguson[1] motion regarding the destroyed evidence and a motion for bond reduction on the basis that none of the fingerprints found at the scene belonged to the Petitioner. The Petitioner said that from reviewing the discovery, he learned that the person the State intended to use to introduce the CVS surveillance video at trial had been the manager for only a few months and was not the manager at the time the video was made. The Petitioner asked counsel to file a motion to exclude the evidence if the State could not find the person who was the manager at the time the video was made, and counsel complied.

The Petitioner said that the victim testified at trial about the behavior of her pets after the burglary. The Petitioner said that he did not know anything about the victim's pets until trial and that counsel did not file a pretrial motion to exclude the testimony.

The Petitioner stated that he and counsel discussed the sentencing ranges for the charged offenses and that counsel advised him that his sentences would be concurrent because they were part of a "crime spree." The Petitioner said that Ms. Tate-Johnson was emotional during her testimony at the sentencing hearing because she had been a victim of a burglary two weeks prior to trial. He said that "my interpretation of that is she was – she has been a victim of burglary more than once during my incarceration."

---

[1]In State v. Ferguson, 2 S.W.3d 912, 915-18 (Tenn. 1999), our supreme court addressed whether a defendant was entitled to relief when allegedly exculpatory evidence was lost or destroyed by the State.

The Petitioner said that he did not talk to counsel about the issues counsel planned to raise at the motion for new trial and did not request that counsel raise the State's failure to reveal prior to trial that Ms. Tate-Johnson had been a victim of a crime. The Petitioner was not cross-examined by the State.

The State called the Petitioner's counsel to testify. Counsel testified that he was licensed to practice in 2007 and that his practice was primarily criminal defense. He was appointed to the Petitioner's case in January 2011. Another attorney volunteered to work on the case with counsel; co-counsel spent approximately forty-five hours on the case and sat as "second" during the trial.

Counsel said that the Petitioner had ten to twelve court dates and that he met with the Petitioner "for an extended period of time at each one." Counsel visited the Petitioner at least five or six times at the jail and interviewed the Petitioner in person or by telephone approximately thirty times. As soon as counsel received discovery, he made a copy and provided it to the Petitioner. The Petitioner complained to the Board of Professional Responsibility that counsel did not provide discovery. Counsel was advised to give the Petitioner another copy of discovery. Counsel did so, but the Petitioner filed another complaint against counsel. Counsel said that the discovery was approximately 800 pages and that he reviewed the discovery with the Petitioner.

Counsel said that prior to trial, he filed fourteen motions in limine. Additionally, he filed an "extensive" bond reduction motion and a Ferguson motion concerning the destroyed evidence. Counsel said that after a hearing, the trial court denied the Ferguson motion, reasoning "that there was so much other substantive information that the witnesses provided regarding the crime that this one area didn't affect it in such a bad way, because the State really had a very very solid case in this situation." Counsel met with the Petitioner before the motion for new trial and explained that an issue had to be raised in the motion for new trial before it could be raised on appeal. Thereafter, the Petitioner provided counsel with a handwritten list of the issues he wanted addressed. Counsel researched the issues and discovered that none of the Petitioner's issues "h[e]ld any water[.]" Counsel also researched the Ferguson issue and learned that the case law "was completely 100 percent opposite" of the defense's position. He discussed the issues with three experienced attorneys and was advised that the Ferguson argument would not be successful. After those discussions, counsel informed the Petitioner that he saw nothing of merit in the issues the Petitioner wanted raised on appeal. Counsel spoke with another attorney about the Petitioner's case, and, after obtaining the attorney's permission, he advised the Petitioner to call the attorney to discuss his appellate issues.

Counsel said that he did not know prior to trial that the victim would testify that her pets' behavior changed after the offenses. Counsel opined:

I think that was honestly, I don't particularly care for everybody knowing, but I think that was a brilliant question left by the district attorney's office to ask. It created a great sympathetic movement for anyone who is an animal lover on the jury and . . . at the preliminary hearing it never came up and it was just a great question that they asked and it's the facts, I mean, people love dogs and animals and if your dog acts weird people get upset and that is basically what it did. It was a very strong, strong statement.

Counsel said that no "hardcore" proof was presented that the pets were physically harmed during the burglary.

Counsel said that he discussed sentencing, including the Petitioner's range and the possibility of consecutive sentencing, with the Petitioner on several occasions. He acknowledged that he advised the Petitioner that some of his crimes might be considered a "crime spree." Specifically, counsel believed the Petitioner's theft conviction would be merged into his aggravated burglary conviction, which the trial court did at the sentencing hearing. Counsel warned the Petitioner that he likely would not receive leniency due to his extensive criminal record.

Counsel opined that Ms. Tate-Johnson's being a victim of a burglary prior to trial had no effect on the trial, noting that her testimony was limited and "quite unemotional."

Counsel stated that prior to trial, he advised the Petitioner that the State's case was strong and that the Petitioner likely would be convicted at trial. Counsel believed that raising the issue of the sufficiency of the evidence was "a completely frivolous argument as was almost all of the appeal."

On cross-examination, counsel acknowledged that he did not represent the Petitioner at the preliminary hearing but said that he gave the Petitioner a "mock transcript" of the preliminary hearing because the hearing had not been transcribed. Counsel did not hire an investigator because he did not feel that it was needed. Counsel did not personally interview Ms. Tate-Johnson but learned about her prospective testimony during two pretrial hearings. Counsel opined that the testimony at the pretrial hearings was "more beneficial . . . than interviewing, because once you have them on the stand if they change their story you've nailed them down." Counsel acknowledged that he did not interview the victim prior to trial but stated that he would have been aware of her testimony at the preliminary hearing. Counsel said that "in this situation her statement was that her house was broken into and I felt that Mr. – the other, the other people's testimony was more important." Counsel attempted to contact the owner of the pawn shop, but the owner did not respond to his calls.

Counsel acknowledged that he did not file a pretrial motion to exclude the victim's trial testimony regarding the behavior of her pets. He did not object to the testimony during trial "[b]ecause it is her position other than it's her speculation, but she can testify, it is her house." Counsel said that the victim did not identify the Petitioner as the perpetrator. Counsel did not recall the State's asking the victim about the value of the stolen property on direct examination but did recall that she decribed the rings that were taken. When asked if he "elicited the testimony regarding the value of the items, counsel responded, "I did? . . . Oh, good, okay. Then it did come up, okay." Counsel explained that his goal in cross-examining the victim was to see how "solid [she was] on the facts."

Counsel was not sure when he learned that Ms. Tate-Johnson had been a victim of a burglary but thought it was at the sentencing hearing. He knew, however, that "there had been a lot of burglaries in this particular area." On appeal, counsel did not raise an issue regarding the admission of evidence that Ms. Tate-Johnson had been a victim of a burglary. Counsel thought that cross-examining Ms. Tate-Johnson regarding her potential bias as a burglary victim could have made her a sympathetic witness, and he made a strategic decision not to do so.

Counsel acknowledged that the statement of facts in the Petitioner's appellate brief was "not written in a narrative form" and that it "just contain[ed] citations to the record and witness's testimony and [wa]s not formatted in[to] complete sentences." He did not explain why he wrote the brief that way. On appeal, counsel raised the Ferguson issue, a challenge to the admission of photographs from the CVS security video, and the imposition of consecutive sentencing. Counsel said that he chose not to appeal the sufficiency of the evidence because the State's case was strong, and he had no argument that would be successful. Counsel acknowledged that the failure to raise issues in an appellate brief often foreclosed appellate review of those issues.

Counsel checked out the appellate record but was not sure whether he noticed that the transcript of the hearing on the Ferguson motion was not in the record. He acknowledged that the inadequacy of the appellate record caused this court to consider the Ferguson issue waived.

After the hearing, the post-conviction court issued an order denying the petition. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means

evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). The same test is used to determine the effectiveness of trial counsel and appellate counsel. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

The Petitioner complains that his counsel was ineffective at trial by failing to investigate or interview witnesses prior to trial. He argues that with a more thorough investigation, counsel would have been prepared to limit the victim's irrelevant testimony

regarding her pets' behavior after the crimes. He contends that "[t]he only purpose for th[e] question [about the victim's pets] was to prejudice the jury against [the Petitioner] through appealing to the emotions of the jury." At the post-conviction hearing, counsel conceded that he did not interview either the victim or Ms. Tate-Johnson prior to trial. He said that he cross-examined Ms. Tate-Johnson at a pretrial hearing to get her "story . . . nail[ed] . . . down." Regarding the victim, counsel asserted that he reviewed her testimony at the preliminary hearing. This court has previously cautioned that "it is unwise for any criminal defense attorney not to at least make an effort to have potential witnesses interviewed even if the witnesses are uncooperative." Paul Neil Laurent v. State, No. M2008-01836-CCA-R3-PC, 2009 WL 2502004, at *8 (Tenn. Crim. App. at Nashville, Aug. 17, 2009). However, the Petitioner failed to prove what further investigation would have revealed. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Moreover, the post-conviction court found that the allegation of prejudice regarding the testimony about the victim's pets was merely speculative. Particularly in light of counsel's testimony regarding the strength of the State's case against the Petitioner, we agree with counsel and the post-conviction court. This court has previously stated that "[p]rejudice is not established by speculation." William L. Handley v. State, No. 01C01-9301-CC-00025, 1993 WL 331819, at *3 (Tenn. Crim. App. at Nashville, Aug. 26, 1993). The Petitioner is not entitled to relief on this issue.

Additionally, the Petitioner contends that counsel was ineffective because he established an element of the offense of theft, namely the value of the items taken, during his cross-examination of the victim. Counsel testified that his goal in cross-examining the victim was "to see how solid [she was] on the facts, to see if there [was] anything that [would] lead to a different presumption[.]" The post-conviction court found that "the questions asked by counsel on cross-examination [were] within the purview of counsel's strategy." We agree. Generally, "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "'20-20 hindsight.'" State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). The post-conviction court also found that the Petitioner failed to show prejudice because he did not show "that the elements of the offenses would not have been established but for these questions." We agree. The State could have asked about the value of the stolen items on redirect examination. See State v. Rafael A. Bush, No. M2002-02390-CCA-R3-CD, 2004 WL 794755, at *14 (Tenn. Crim. App. at Nashville, Apr. 14, 2004). Regardless, the Petitioner failed to show how he was prejudiced in this regard.

Next, the Petitioner complains that counsel was ineffective on direct appeal. He

argues that the brief submitted by counsel "was so deficient that it was tantamount to having no brief filed at all." This court has previously observed:

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter, 126 S.W.3d at 887.

Our supreme court has set forth the following "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue":

> 1) Were the omitted issues "significant and obvious"?
> 2) Was there arguably contrary authority on the omitted issues?
> 3) Were the omitted issues clearly stronger than those presented?
> 4) Were the omitted issues objected to at trial?
> 5) Were the trial court's rulings subject to deference on appeal?
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> 7) What was appellate counsel's level of experience and expertise?
> 8) Did the petitioner and appellate counsel meet and go over possible issues?
> 9) Is there evidence that counsel reviewed all the facts?
> 10) Were the omitted issues dealt with in other assignments of error?
> 11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id. at 888.

The post-conviction court cited this court's opinion on direct appeal, in which we noted the inadequacy of the brief and the appellate record and concluded that counsel was deficient on appeal. See State v. William Thomas Mayers, No. M2011-00954-CCA-R3-CD, 2012 WL 4572169 (Tenn. Crim. App. at Nashville, Oct. 1, 2012). The post-conviction court stated that the Petitioner had

> not shown, or even suggested, that a "specific issue should have been addressed by the appellate brief which would have had the effect of changing the result of the appeal had it been discussed." Instead, he simply argues that he suffered prejudice because the Court of Criminal Appeals was unable to consider some of his claims. [The post-conviction court] finds that this is not enough to demonstrate that the outcome of the appeal would have been different had counsel effectively briefed the issues, and therefore does not satisfy the prejudice prong of the Strickland analysis.

We agree.

The Petitioner argues that he was prejudiced by the deficiency because his Ferguson issue was waived on appeal due to counsel's failure to include a transcript of the motion hearing or to provide a "coherent legal argument" on the issue. Id. at *2. In order to determine prejudice, we must consider whether the Petitioner's Ferguson issue has merit.

We note that the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963). Our supreme court has explained:

> The language of the "due process" provisions in the United States Constitution differs from the "law of the land" provision found in the Tennessee Constitution. Although the terms on occasion have been viewed as synonymous, the United States Supreme Court's interpretations of the United States Constitution establish a minimum level of protection while this Court, as final arbiter of the Tennessee Constitution, is always free to extend greater protection to its

- 10 -

citizens.

Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000) (citations omitted).

In State v. Ferguson, 2 S.W.3d 912, 915-18 (Tenn. 1999), our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id.

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, we must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. We will review a trial court's decision concerning the fundamental fairness of the trial under a de novo standard. State v. Merriman, 410 S.W.3d 779, 790 (Tenn. 2013). In the event we determine the trial would be fundamentally unfair in the absence of the lost evidence, we will review the remedy applied by the trial court under an abuse of discretion standard. Id.

In its order regarding the Ferguson motion, the trial court found that the State had the duty to preserve the stolen rings. The trial court further found that the destruction of the stolen rings was not attributable to the State's negligence, noting that Detective Wallace had put a hold on the evidence pursuant to police policy. The trial court also found that the evidence was "rather significant due to the fact that it connects the victim's items with the pawn shop on the day of the burglary." Nevertheless, the trial court found that "there [wa]s secondary or substitute evidence available in the form of the victim's identification of the rings and description provided." The trial court noted that the State

possessed substantial evidence that would support a conviction, including the pawn shop's records reflecting that the Petitioner pawned the stolen items the day of the burglary, the victim's positive identification of the stolen items, and the detective's witnessing of the identification. Additionally, the trial court found "that this loss of evidence should be remedied by a proper jury instruction."

The post-conviction court found that even if counsel was deficient regarding the Ferguson issue, the Petitioner failed to prove prejudice. From the record before us, we likewise conclude that the Petitioner would not have been entitled to relief on the Ferguson issue on appeal and that, accordingly, he was not prejudiced by counsel's deficiency regarding the appeal of that issue.

### III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.


_____
NORMA MCGEE OGLE, JUDGE